**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA                          CIVIL ACTION

VERSUS                                                      NO. 07-3264

ELVIN L. MARTINEZ                                    SECTION: "K"(4)


## ORDER AND REASONS

Before the Court is an appeal from a trial and subsequent memorandum opinion (Rec.

Doc. No. 1) by the bankruptcy court (Brown, J.).[1]


## I.  FACTUAL BACKGROUND

The case at hand presents the most recent installment in what has become the long and

colorful history of litigation concerning the Walter Hoyt partnerships.  The following are the

background facts as found by the bankruptcy judge.  Over approximately 30 years, Hoyt formed

numerous partnerships that were created to own, breed and manage sheep and cattle.  These

partnerships were used by Hoyt as illegal tax shelters and to defraud his partners.  The IRS

investigated Hoyt during the 1980's and 1990's, even attempting to invalidate transactions

involving the Hoyt partnerships in 1989, but to no avail.  *See Bales v. Comm'r*, 58 T.C.M.

(CCH) 431 (1989).  It was not until 1999 that Hoyt was convicted of various fraud, conspiracy,

---

[1]*In re Martinez*, 366 B.R. 604 (Bankr. E.D. La. 2007) (Brown, J.).

and money laundering charges. In his wake, Hoyt has left a trail of litigation regarding his partnerships, among them is the case at hand.[2]

Debtor Elvin Martinez first joined Hoyt's partnerships in December 1985 after meeting with a Hoyt representative. Martinez signed three subscription agreements himself, and a fourth agreement was signed by Hoyt on behalf of Martinez. Martinez remained in these partnerships until 1994. Hoyt was designated as tax matters partner ("TMP") for all of the Hoyt partnerships.

As to the 1987-1989 tax years, the Internal Revenue Service (IRS) sought Hoyt's consent as TMP for the partnerships to receive extensions of the three-year statute of limitations for issuing notices of final partnership administrative adjustment ("FPAA"). These extensions were signed by Hoyt between February 1991 and March 1993. These extensions gave the IRS until December 31, 1993 to issue notices of FPAA. In late 1993, the IRS sent notices of FPAA to Hoyt as TMP for the partnerships for the tax years 1987-89. The parties agreed that these FPAAs are timely only if the extensions signed by Hoyt are valid.

As to the 1990-1993 tax years, the IRS sent timely notices of FPAA to Hoyt, *i.e.*, no extensions of the statute of limitations were needed by the IRS. In response, Hoyt filed timely

_____

[2]It is without a doubt that Walter Hoyt and his partnerships have the uncanny ability to produce litigation. Cataloging the entirety of these actions would be a near-sisyphean task, but it suffices to say that the Hoyt partnerships have been the subject of opinions in at least four federal circuit courts of appeal, various district and bankruptcy courts, as well the federal Tax Court. *See Hansen v. Comm'r*, 471 F.3d 1021 (9th Cir. 2006); *Van Scoten v. Comm'r*, 439 F.3d 1243 (10th Cir. 2006); *Mortensen v. Comm'r* (6th Cir. 2006); *Grassmueck v. American Shorthorn Ass'n*, 402 F.3d 833 (8th Cir. 2005); *River City Ranches #1 Ltd. v. Comm'r*, 401 F.3d 1136 (9th Cir. 2005); *Mekulsia v. Comm'r*, 389 F.3d 601 (6th Cir. 2004); *Myers v. United States*, 883 F. Supp. 526 (D. Or. 1995); *In re Dees*, 369 B.R. 676, 679 (Bankr. N.D. Fla. 2007) (citing cases and noting that "[c]ases spawned by Hoyt's partnerships demonstrate that the tax questions likely to be raised in this proceeding are not well-settled"); *In re Wargo*, 325 B.R. 858 (Bankr. M.D. Fla. 2005); *In re Leland*, 160 B.R. 834 (Bankr. E.D. Cal. 1993); *Juell v. Comm'r*, T.C. Memo. 2007-219, 2007 WL 2262888 (U.S. Tax Ct. Aug. 8, 2007); *Bales v. Comm'r*, 58 T.C.M. (CCH) 431 (1989).

petitions in tax court contesting all of the FPAAs for the partnerships for the years 1987 through 1993.[3]  At the time of the bankruptcy court's opinion, all of these petitions filed by Hoyt were still being litigated in tax court.  Hoyt was eventually removed as the TMP of all of the relevant partnerships by motion of the IRS in 2003.

Debtor Martinez filed a petition under Chapter 7 of the Bankruptcy Code on August 2, 2002.  The case was designated as a "no asset" case, a discharge order was entered and the case closed on November 14, 2002.  On October 3, 2003, the case was reopened to allow Martinez to file a complaint against the IRS seeking a determination that the income tax liabilities owed by Martinez for the years 1987 through 1993 were discharged under the Bankruptcy Code.

The bankruptcy court first ruled on Martinez's petition in February 2005, finding that none of Martinez's taxes were discharged and granting summary judgment in favor of the IRS.  *In re Martinez*, 323 B.R. 650 (Bankr. E.D. La. 2007) (Brown J.).  On appeal, this Court affirmed the bankruptcy court's holding that the government's "mere criminal investigation" of Hoyt did not immediately create a conflict of interest that would "automatically invalidate[] his acts."  *Martinez v. United States*, No. Civ. A. 05-1396, 2005 WL 2065307, at *3 (E.D. La. June 30, 2005) (Duval J.).  However, this Court remanded for consideration of whether an *actual* conflict of interest existed between Hoyt and his partners,  regardless of any criminal investigation, and whether the IRS knew of such conflict of interest.  *Id.*  This remand was made in light of a similar remand issued by the Ninth Circuit in another case involving Hoyt, in which that court found that a "disabling conflict of interest may have existed in the Hoyt cases . . . not only because of past criminal investigations of Hoyt by the IRS, but also by Hoyt's ongoing fraud and

_____

[3]Under 26 U.S.C. § 6226(a), the TMP for a partnership has up to 90 days after the IRS mails the notice of an FPAA to file a petition challenging the FPAA.

theft, committed against his partners." *Id.* (quoting *River City Ranches #1 Ltd. v. Comm'r*, 401 F.3d 1136, 1141-42 (9th Cir. 2005) (hereinafter "*River City Ranches II*")).[4]

In March 2006, the bankruptcy court on remand denied cross motions for summary judgment, finding that indeed an issue of material fact existed regarding whether Hoyt had a conflict of interest when he performed acts on behalf of the partnership between 1987-1993. *In re Martinez*, 341 B.R. 568 (Bankr. E.D. La. 2006) (Brown, J.).   Consequently, the bankruptcy court then held a two-day trial, and on April 13, 2007 it issued its memorandum opinion, dividing its holding into two time periods: tax years 1990-1993 and tax years 1987-1989. *In re Martinez*, 366 B.R. 604 (Bankr. E.D. La. 2007).  With regards to the 1990-93 tax years, Judge Brown held that Martinez's taxes were not discharged for those tax years because the IRS had filed timely FPAAs, and Hoyt responded by filing tax court petitions contesting the FPAAs. *Id.* at 611-12.  Judge Brown concluded that, under present statutory and case law, a petition contesting an FPAA immediately tolls the running of any statute of limitations because the IRS is "prevented from assessing a tax while a petition is pending before the tax court." *Id.* at 610 (discussing courts of appeals cases interpreting 26 U.S.C. § 6229(d)).  With regards to the earlier tax years of 1987-1989, however, Judge Brown found that the taxes were discharged and the IRS could no longer assess taxes for those years.  The court reasoned that the extensions of the statute of limitations signed by Hoyt for those tax years were invalid because Hoyt had a "disabling

---

[4]The *River City Ranches* opinions are frequently referred to numerically in other courts' opinions.  For the purposes of consistency, they will be referred to likewise here.  The original tax court memo (*River City Ranches #1, Ltd. v. Comm'r*, T.C. Memo. 2003-150, 2003 WL 21205284 (U.S. Tax Ct. May 23, 2003) (*River City Ranches I*) was reversed in part and remanded by the Ninth Circuit, 401 F.3d 1136 (9th Cir. 2005) (*River City Ranches II*).  Subsequently, the tax court reconsidered the case on remand, *River City Ranches #1, Ltd. v. Comm'r*, T.C. Memo. 2007-171, 2007 WL 1891595 (U.S. Tax Ct. July 2, 2007) (*River City Ranches III*).

conflict of interest" that extinguished his authority to sign those extensions on behalf of the partnership. *Id*. at 618.

On June 12, 2007, the United States and Martinez cross-appealed the bankruptcy court's decision to this Court.

## II.  STANDARD OF REVIEW AND ISSUES ON APPEAL

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).[5]  In reviewing an appeal from the bankruptcy court, "fact findings of the bankruptcy court are reviewed under a clearly erroneous standard and issues of law are reviewed *de novo*." *In re Soileau*, 488 F.3d 302, 305 (5th Cir. 2007).  Mixed questions of law and fact are also reviewed by this Court *de novo*.  *In re Stonebridge Technologies, Inc.*, 430 F.3d 260, 265 (5th Cir. 2005).  As stated by the bankruptcy court, in suits regarding the dischargeability of a debt under § 523(a), the creditor seeking to have its debt excepted from discharge bears the burden of proof by a preponderance of the evidence.  *In re Keaty*, 397 F.3d 264, 270 (5th Cir. 2005) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).  In determining whether a particular debt falls within one of the exceptions of § 523, the statute should be "'narrowly construed against the creditor and in favor of the bankrupt.'"  *Matter of Boyle*, 819 F.2d 583, 588 (5th Cir. 1987) (quoting *In re Cross*, 666 F.2d 873, 879-80 (5th Cir. 1982)).

As set forth by the bankruptcy court, "'The expiration of the period of limitation on assessment is an affirmative defense, and the party raising it must specifically plead it and carry

_____

[5]Title 20, United States Code, Section 158(a) states, "The district courts of the United States shall have jurisdiction to hear appeals . . . (1) from final judgments, orders, and decrees; . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title."  20 U.S.C. § 158(a).

the burden of proving its applicability.'" *Madison Recycling Assoc. v. Comm'r*, 295 F.3d 280,

286 (2d Cir. 2002) (quoting *Amesbury Apartments, Ltd. v. Comm'r*, 95 T.C. 227, 240, 1990 WL

128878 (1990)).  The taxpayer must first establish a *prima facie* case "establishing the filing of

the partnership return, the expiration of the statutory period, and receipt or mailing of the notice

after the running of the period." *Madison Recycling*, 295 F.3d at 286.  If this showing is made,

"the burden of the production then shifts to the Commissioner to show that the bar of the

limitations period is not applicable." *Id*. (citations omitted).  Finally, "if the Commissioner

succeeds, the burden shifts back to the taxpayer to show that the alleged exception to the

expiration of the limitations period is ineffective or otherwise inapplicable. *Id*. (citing *Amesbury

Apartments*, 95 T.C. at 241).  The burden of persuasion always remains on the taxpayer.  *Id*.

This Court will address the following issues on appeal as presented by the parties:  (1)

Whether the bankruptcy court erred in finding that Walter Hoyt had a disabling conflict of

interest with his fellow partners such that extensions signed by him were invalid and did not toll

the statutes of limitations for assessment of taxes for tax years 1987-1989, and (2) whether the

bankruptcy court erred in finding that the tax court petitions filed by Walter Hoyt tolled the

statute of limitations for the assessment of taxes for the tax years 1990-1993, at which time again

Martinez alleges that Hoyt had a disabling conflict of interest.

## III.  ANALYSIS

As a general overview prior to addressing the disposition of this case, § 523(a)(1)(A) of

the Bankruptcy Code provides that, where a debtor has been granted a discharge of debts, that

discharge does not apply to certain kinds of debts, including debts listed under § 507(a)(8) of the

Code.[6]  Section 507(a)(8)(A)(iii) of the Code states that debts that are not discharged under § 523 include "[a]llowed unsecured claims of governmental units, only to the extent that such claims are for . . . (A) a tax on or measured by income or gross receipts . . . (iii) other than a tax . . . not assessed before, but assessable, under applicable law or by agreement, after, the commencement of the case."  11 U.S.C. § 507(a)(8)(A)(iii).  The bankruptcy court held that this section "refers to taxes which are still assessable after the commencement of the case, including taxes for which a tax court case is pending at the time of the bankruptcy filing."  *Martinez*, 366 B.R. at 609.  There appears to be no dispute as to the interpretation of these statutes.

Relevant to the entire analysis in this case is the statute of limitations provision for assessment of taxes by the IRS.  Title 26, United States Code, Section 6229(a) provides:

(a) **General rule** - - Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of –

(1) the last day on which the partnership return for such taxable year was filed, or

(2) the last day for filing such return for such year (determined without regard to extensions).

26 U.S.C. § 6229(a).  The TMP has the authority to extend statutes of limitations for the

---

[6]Title 11, United States Code, Section 523(a)(1)(A) provides, in relevant part:

(a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt - -
(1) for a tax or customs duty - -

(A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed . . . .

11 U.S.C. § 523(a)(1)(A).

7

assessment of taxes by agreement with the IRS.[7]  The present case addresses "whether these [Martinez's] taxes are still assessable in light of the evidence at trial" for the specific tax years at issue, or whether the three-year statute of limitations has run.  *Martinez*, 366 B.R. at 609.


**A.  Tax Years 1990-1993: Petitions Challenging FPAAs**

The issue of whether the tax court petitions filed by Walter Hoyt validly tolled the statute of limitations for the assessment of taxes for the tax years 1990-1993 presents the more straightforward legal analysis, and therefore this issue will be addressed first.

As stated above, a three-year statute of limitations applies to the assessment of all taxes by the IRS "[e]xcept as otherwise provided" in § 6229.  26 U.S.C. § 6229(a).  Subsection (d) of § 6229 states the statute of limitations for assessments is temporarily suspended if the IRS mails an FPAA within the statute of limitations, and also that if the TMP files a petition with the Tax Court challenging the FPAA, then it is again suspended.  The statute states:

> If notice of a final partnership administrative adjustment

---

[7]Section 6229 states that the statute of limitations may be extended, and extensions may be granted for extension periods as well:

> The period described in subsection (a) (including an extension period under this subsection) may be extended –
>
> > (A) with respect to any partner, by an agreement entered into by the Secretary with such partner, and
> >
> > (B) with respect to all partners, by an agreement entered into by the Secretary and the tax matters partner (or any other person authorized by the partnership in writing to enter into such an agreement),
>
> before the expiration of such period.

26 U.S.C. § 6229(b)(1).

8

[FPAA] with respect to any taxable year is mailed to the tax matters partner, the running of the period specified in subsection (a) (as modified by other provision of this section) shall be suspended –

(1) for the period during which an action may be brought under section 6226 (and, *if a petition is filed under section 6226 with respect to such administrative adjustment*, until the decision of the court becomes final), and

(2) for 1 year thereafter.

26 U.S.C. § 6229(d) (emphasis added).  In the present case, there is no dispute that the IRS timely filed FPAAs for the tax years 1990-1993.  Moreover, there is also no dispute that Hoyt timely filed petitions challenging the FPAAs filed by the IRS for these tax years.[8]  Therefore, the relevant issue for the tax years 1990-1993 becomes whether Hoyt had the authority to file the petitions despite his alleged conflict of interest.  If he did not have such authority, then the statute of limitations would have likely run (barring any other tolling), and the IRS would be prevented from assessing taxes against Martinez.  However, because this Court finds that, regardless of any alleged conflict of interest that could obviate his authority, Hoyt's petition filings were valid, the statute of limitations was tolled and taxes are still assessable for the tax years 1990-1993.

In the proceedings below, the bankruptcy court found that the fact that Hoyt submitted petitions to the tax court challenging the FPAAs, regardless of whether he had the authority to do so, resulted in the taxes for 1990-1993 being found still assessable.  The court applied 26 U.S.C. § 6229(d), evaluated the relevant case law interpreting that statute, and reached the same

---

[8]26 U.S.C. § 6226(a) provides, "Within 90 days after the day on which a notice of a final partnership administrative adjustment is mailed to the tax matters partner, the tax matters partner may file a petition for a readjustment of the partnership items for such taxable year with . . . (1) the Tax Court . . . ."

conclusion as those precedents, namely that "even an unauthorized or otherwise defective petition to the tax court challenging an FPAA extends the statute of limitations for the IRS to make an assessment of a taxpayer's income." *Martinez*, 366 B.R. at 609-10.

The case most on point is *O'Neill v. United States*, 44 F.3d 803 (9th Cir. 1995) in which taxpayers that were members of a partnership sued for a refund, claiming that the tax on the partnership was assessed after the statute of limitations had expired. *Id.* at 804. The taxpayers specifically claimed that the statute of limitations had not been tolled by the TMP's filing of petitions challenging FPAAs because the TMP had filed for personal bankruptcy three months before filing the petitions. *Id.* at 805. Because the TMP's bankruptcy immediately stripped him of his TMP status under federal regulations, the petitions were without any authority from the partnership (a "legal nullity"), and thus did not toll the statute of limitations. *Id.*

The Ninth Circuit, however, rejected the taxpayers' arguments. The court held that, regardless of whether the TMP had authority to file the petition, the effect of the filing of the petition was the same: the case was placed on the Tax Court docket and "the Commissioner had to refrain from assessing the tax until the case was final" under 26 U.S.C. § 6225.[9] *Id.* at 806.

---

[9]Section 6225(a) reads:

> (a) **Restriction on assessment and collection. –** Except as otherwise provided in this subchapter, no assessment of a deficiency attributable to any partnership item may be made (and no levy or proceeding in any court for the collection of any such deficiency may be made, begun, or prosecuted) before –
> > (1) the close of the 150th day after the day on which a notice of final partnership administrative adjustment was mailed to the tax matters partner, and
> > (2) if a proceeding is begun in the Tax Court under section 6226 during such 150-day period, the decision of the court in such proceeding has become final.

26 U.S.C. § 6225(a).

The Ninth Circuit followed the holding of a Second Circuit case, *American Equitable Assurance Co. v. Helvering*, 68 F.2d 46 (2d Cir. 1933),[10] reasoning that the docketing with the Tax Court and the mandatory stay from assessment until the Tax Court rules must toll the statute of limitations because, alternatively, if the Tax Court took too long to conclude that the petition was wrongly filed, "the Commissioner could risk being completely barred from assessing a properly-owed tax." *O'Neill*, 44 F.3d at 805.

In response, Martinez claims that the same conflict of interest that invalidates the 1987-1989 extensions should also invalidate the 1990-1993 petitions filed by Hoyt. Appellee's Brief at 18 (hereinafter "App."). Martinez cites the same case law, *Transpac* and *River City Ranches #1*, for the position that "[a] TMP may not take actions which bind the partnership when he is under a conflict of interest." *Id.*, *citing River City Ranches II*, 401 F.3d at 1141; *Transpac Drilling Venture 1982-12 v. Comm'r*, 147 F.3d 221, 277 (2d Cir. 1998). Because "[t]he IRS knew of the conflicts," therefore Martinez claims that it "should not be able to benefit from them." *Id.* at 20.

There is little need to address Martinez's specific claims regarding a conflict of interest at this point in the opinion, although they will certainly be addressed later in this opinion. The reason is because, regardless of any conflict of interest on behalf of Hoyt, Martinez's argument fails. First and foremost, Martinez's allegation does not address the relevant statutory language of § 6226 that creates an absolute bar against the IRS from assessing any taxes while a petition is pending. Even if the IRS does gain some benefit from Hoyt's unauthorized petition, there does

---

[10]In *American Equitable Assurance*, the Second Circuit addressed the application of § 277 of the Revenue Act of 1926, codified at 26 U.S.C. § 1057(a)(2), the predecessor statute to § 6226. *American Equitable Assurance Co. v Helvering*, 68 F.2d 46, 47 (2d Cir. 1933).

not appear to be any action the IRS can take because the FPAA is on the Tax Court's docket. Martinez alleges that the "IRS could have removed Hoyt" as TMP after the filing, App. at 13, but it is not clear whether the IRS could take such action at that time, or whether even doing so would have any effect on the pending petition because of the absolute bar against the IRS taking any action. The fault, if any, appears not to lie with the IRS, but rather with the statute that appears to deprive the IRS of any ability to take any action against a partnership once a petition has been filed.

Moreover, the cases on which Martinez relies, *Transpac* and *River City Ranches II*, do not address § 6226, instead only discussing the validity of extensions of the statute of limitations signed by the TMP where the TMP has a conflict of interest. In contrast, the significant weight of case law directly addressing petitions challenging FPAAs that were improperly filed by TMPs have found that § 6226(a) (or similar statutes) tolls the statute of limitations because the IRS is barred from assessing taxes while the case is pending, regardless of the validity of the petitions.[11]

This Court adopts the reasoning of *O'Neill*, and reaches the same holding. The clear language of the § 6226(a) permits the TMP to "file a petition for a readjustment of the partnership items . . . [with] the Tax Court . . . ." 26 U.S.C. § 6226(a)(1). Section 6225(a) furthermore states that "no assessment of a deficiency attributable to any partnership item may be made . . . if a proceeding is begun in the Tax Court under section 6226 during such 150-day period, [before] the decision of the court in such proceeding has become final." 26 U.S.C. §

---

[11]*See Martin v. Comm'r*, 436 F.3d 1216 (10th Cir. 2006) (addressing analogous statute, 26 U.S.C. § 6503(a)(1), and tolling statute of limitations as applied to individual taxpayer); *O'Neill v. United States*, 44 F.3d 803 (9th Cir. 1995) (applying § 6226 to partnership); *United States v. Shahadi*, 340 F.2d 56 (3d Cir. 1965) (addressing predecessor statute § 277); *American Equitable Assurance Co. v. Helvering*, 68 F.2d 46 (2d Cir. 1933) (addressing § 277).

6225(a)(2).  As lucidly reasoned in *O'Neill*, it would absurd for Congress to intend on the statute

of limitations to run while the IRS was prevented from taking any action against a partnership

because if the petition turns out to be meritless, there is the potential of the IRS being time-

barred from assessing a valid tax solely because it was challenged by the partnership.  "Clearly,

this is not what Congress intended."  *O'Neill*, 44 F.3d at 806.  A much more logical aim would

be for the statute of limitations to be tolled until the Tax Court makes its decision, and this Court

takes that view.

There appears no dispute that Hoyt was the designated TMP when he timely filed the

petitions challenging the IRS's FPAAs, and under § 6225 that petition immediately suspended

any assessments by the IRS regardless of whether Hoyt had a conflict of interest because the

petition was on the Tax Court's docket.  Because of this bar against the IRS, the three-year

statute of limitations should have been tolled until the Tax Court decisions became final.


**B.  Tax Years 1987-89: Disabling Conflict of Interest**

In contrast to the tax years 1990-1993, the controversy concerning the tax years 1987-

1989 presents different issues.  Indeed, the bankruptcy court understood that this Court

remanded this case for further factual development due to the dispute regarding these tax years.

*See Martinez*, 366 B.R. at 612.  In this Court's prior consideration, it found that a "mere criminal

investigation" did not result in Hoyt having a conflict of interest.  *Martinez v. United* States, No.

Civ. A. 05-1396, 2005 WL 2065307, at *3 (E.D. La. June 30, 2005) (Duval, J.).  However, this

Court did note that the Ninth Circuit, in a case also addressing the Hoyt partnerships, held that

past criminal investigations along with "Hoyt's ongoing fraud and theft, committed against his

partners," suggested that a disabling conflict of interest could have existed. *Id.* at \*4, *quoting River City Ranches II*, 401 F.3d at 1142. *River City Ranches II* was a case based on very similar facts (i.e., the IRS sought extensions from Hoyt as TMP for his partnerships that were granted while the IRS investigated Hoyt for fraud), in which the Ninth Circuit decided to remand the case because the court found that extensions granted to the IRS by Hoyt may have been against the interest of his partners. *River City Ranches II*, 401 F.3d at 1142. This Court decided to similarly remand to the bankruptcy court to determine if other facts could be ascertained that would prove that Hoyt had an actual conflict of interest with his partners. *Martinez*, 2005 WL 2065307, at \*4.

On remand, the bankruptcy court held a trial and determined that Martinez had borne his burden of proof to establish that Hoyt's conflict of interest invalidated the extensions executed by him on behalf of the partnership. The court found that the TMP is a position designed to operate in a "fiduciary role *vis-a-vis* his other partners," *Martinez*, 366 B.R. at 615, and that under prevailing law in other circuits, an "actual conflict" must exist for a TMP's actions to be invalidated. *Id.* at 614.[12] Using the Ninth Circuit's decision in *River City Ranches II* as its primary point of analysis, the bankruptcy court found that "there was in fact a conflict - a serious conflict between Hoyt's personal relationship with the IRS and the fiduciary duty he owed as the TMP for the partnerships, and as a result, the extensions are invalid." *Id.* at 619. This Court

---

[12]In *Transpac*, the Second Circuit held that "where serious conflicts exist, a TMP may be barred from acting on behalf of the partnership." *Transpac Drilling Venture v. Comm'r*, 147 F.3d 221, 227 (2d Cir. 1998). However, the Second Circuit elaborated on this point in a later case, stating, "Our decision in *Transpac* was based on the presence of an actual conflict. We did not hold that the existence of a criminal investigation by the IRS automatically disqualifies a TMP or his representative from negotiating or entering into agreements with the IRS." *Madison Recycling Associates v. Comm'r*, 295 F.3d 280, 288 (2d Cir. 2002).

agrees with the conclusion of the bankruptcy court.

1.  Can a Disabling Conflict of Interest Invalidate the Extensions of the Statute of Limitations Where the IRS Knew of the Conflict of Interest?

This Court finds that, where a TMP negotiates with the IRS under a disabling conflict of interest, of which the IRS has knowledge, such a conflict may obviate acts taken by the TMP on behalf of the partnership.  In its previous decision, this Court noted that it would not decide whether to follow the *River City Ranches* decision where the Ninth Circuit found that a disabling conflict of interest, if established, would void any actions taken by a TMP on behalf of the partnership.  *Martinez*, 2005 WL 2065307, at *4.  Instead, this Court deferred to the bankruptcy court's evaluation of the case on remand.  In reviewing the bankruptcy court's decision to adopt the *River City Ranches II* holding, this Court now addresses the issue *de novo* and chooses to follow *River City Ranches II.*

It is well-established that the tax matters partner acts as a fiduciary for the rest of the members of a partnership in the performance of duties with the IRS.  As cited by the bankruptcy court, the Tax Court has emphasized the importance of the tax matters partner's role:

> The tax matters partner is the central figure of partnership proceedings.  During both administrative proceedings and litigation, the tax matters partner serves as the focal point for service of all notices, documents and orders on the partnership. . . .  The tax matters partner must also perform important functions within the partnership.  He is required to keep all partners informed of the status of administrative and judicial proceedings involving the partnership.  Section 6223(g).  Moreover, the tax matters partner may, under some circumstances, bind partners who are not notice partners by entering into a settlement agreement with respondent.  Section 6224(c)(3).

> In the execution of these responsibilities a tax matters partner acts as a fiduciary. His personal interest, if any, is beside the point . . . .  The detailed statutory procedures for partnership level audits and litigation contemplate the continual

15

> presence of one tax matters partner, and the procedures cannot operate unless the tax matters partner is capable of acting on the partnership's behalf regardless of his personal tax posture.  As the fiduciary of the partnership's interest in the proceeding, the tax matters partner's initiative (or failure to take initiative) is plainly designed to affect the rights of all partners in the partnership.

*Computer Programs Lambda, Ltd. v. Comm'r*, 89 T.C. 198, 205-06, 1987 WL 42563 (1987)

(cited by *Martinez*, 366 B.R. at 615); *see Mekulsia v. Comm'r*, 389 F.3d 601, 606 (6th Cir. 2004)

('[A] tax matters partner is in a fiduciary relationship relative to the other partners . . . .");

*Madison Recycling Assocs. v. Comm'r*, 295 F.3d 280, 288 (2d Cir. 2002) ("In *Transpac*, we held

that a TMP, although an entity created by statute, owes a fiduciary duty to his partners.").

Subsequent case law of the Ninth and Second Circuits provides that "a TMP may lack

capacity to bind his partners and the partnership where the TMP operates under a conflict of

interest." *River City Ranches*, 401 F.3d at 1141 (citing *Phillips*, 272 F.3d at 1175).  In *Phillips v.*

*Commissioner*, the Ninth Circuit recognized that "[t]rust law, generally, invalidates the

transaction of a trustee who is breaching his trust in a transaction in which the other party is

aware of the breach."  *Phillips*, 272 F.3d at 1175 (citing *Restatement of Trusts*, §§ 288-297).

*River City Ranches II* permitted the plaintiff to obtain discovery to determine whether "Hoyt

executed the extensions under disabling conflicts of interest," recognizing that such discovery

may lead to invalidation of the extensions.  *River City Ranches II*, 401 F.3d at 1141.  Likewise,

the Second Circuit held in *Transpac* that "where serious conflicts exist, a TMP may be barred

from acting on behalf of the partnership."  *Transpac Drilling Venture v. Comm'r*, 147 F.3d 221,

227 (2d Cir. 1998).  While the court later clarified that *Transpac* was based only the presence of

an actual conflict of interest, the Ninth Circuit explained that its holding was founded on the fact

that "[s]ince the TMP's acts bind his partners, the partners secure their due process protection

16

only as a result of the TMP's faithful discharge of his fiduciary obligations." *Madison Recycling Assocs. v. Comm'r,* 295 F.3d 280, 288 (2d Cir. 2002).

The government alleges that the actions of the TMP must bind the defendant, regardless of any conflict of interest.  During oral argument, counsel for the government disagreed that the TMP and partner relationship is founded on trust law considering that courts have noted that under trust law, the actions of a trustee are invalidated where the trustee "is breaching his trust in a transaction in which the other party is aware of the breach."[13]  *Phillips*, 272 F.3d at 1175 (citing *Restatement of Trusts*, §§ 288-297); *see Martinez*, 2005 WL 2065307, at *4 n.11 (quoting *Phillips*).  Counsel did not dispute the fiduciary relationship between the TMP and the rest of the partnership, but instead argued that, if this relationship is to be analyzed in reference to state law, then the analysis should be under agency law instead of trust law.  Similar to a trustee relationship, however, an agency is a "fiduciary relationship."  *Restatement (Third) of Agency* § 1.01 (2006).  Admittedly, a trustee has more control over a beneficiary's property, and thus the level of fiduciary obligations in a trustee-beneficiary relationship is greater than that of the agent-principal relationship.[14]  Nonetheless, agents do have significant power to bind their

---

[13]Oral argument in this matter was held before this Court on September 19, 2007.

[14]The Restatement notes:

[A]s defined in *Restatement Third, Trusts* § 2, a trust is a fiduciary relationship with respect to property that arises from a manifestation of intention to create that relationship; a trustee is not an agent of the settlor or beneficiaries unless the terms of the trust subject the trustee to the control of either the settlor of the beneficiaries.  Principals in agency relationships have power to terminate authority and thus remove the agent; trust beneficiaries, in contrast, do not have power to remove the trustee.

*Restatement (Third) of Agency* § 1.01 cmt. g (2006).

17

principals.  An agent may "affect a principal's legal relations with third parties when a third

party reasonably believes the [agent] has authority to act on behalf of the principal and that belief

is traceable to the principal's manifestations."  *Restatement (Third) of Agency* § 2.03 (2006).

Under this rule, it would appear that Martinez should be bound by Hoyt's actions because

Martinez, as a partner, manifested his empowerment of Hoyt as the agent.  However, the IRS

could only rely on Hoyt's actions insofar as that reliance is based on the *reasonable* belief that

the agent has authority.  Agency law confirms that an agent cannot bind the principal to an

agreement with a third party where the third party knows the agent is not acting on behalf of the

principal.  The Restatement explains:

> An agent does not act with apparent authority in connection with a
> misrepresentation made to a third party when the third party knows or has reason
> to know that the agent does not have authority to make the representation on
> behalf of the principal.  If a third party knows or has reason to know that the
> person who makes a representation to the third party is not an agent of the person
> on whose behalf the representation is purportedly made, the person who makes
> the representation does not act with apparent authority.  *Likewise, an agent does
> not act with apparent authority when the person with whom the agent deals
> knows that the agent is dealing solely on the agent's own behalf and not on the
> principal's behalf.*

*Restatement (Third) of Agency* § 7.08 cmt. c(2) (2006) (emphasis added).[15]  Agency law taken

---

[15]Apparent authority, which depends on the reasonable beliefs, is different from actual
authority, which depends on the reasonable beliefs of the agent:

> An agent acts with actual authority when, at the time of taking action that has
> legal consequences for the principal, the agent reasonably believes, in accordance
> with the principal's manifestations to the agent, that the principal wishes the agent
> so to act.

*Restatement (Third) Agency* § 2.01 (2006).  The two forms of authority are not exclusive, and
indeed "[a]pparent authority often coincides with actual authority."  *Id.* § 2.03 cmt. c.  However,
where an agent has actual authority, but the agent denies that authority to a third party

from the state courts confirms this rule.  Under Louisiana law, a third party may rely on the

representations of an agent, but again "[t]he third party must have a *reasonable* belief based on

the facts that the putative mandatary [agent] in fact has authority."  *Hoffman, Siegel, Seydel,*

*Bienvenu & Centola, APLC v. Lee*, 936 So. 2d 853, 860 (La. Ct. App. 2006).[16]  A sampling of

agency law from other jurisdictions reveals that, as a general rule, where the third party has

actual knowledge that an agent is acting beyond his authority, that third party cannot reasonably

rely on the acts of that agent.[17]

---

> the agent's statement to the third party denying that the agent has authority
> precludes the presence of apparent authority because it is not reasoanble for the
> third party to belief the agent to be authorized.  The third party's ability to hold
> the principal to a transaction entered into on the principal's account by the agent
> will then depend on the third party's ability to prove the existence of actual
> authority.

*Id.*  Thus, even where actual authority indeed exists, the validity of a transaction still depends on
the reasonable reliance of the third party on the actions of the agent.

[16]*See Boulos v. Morrison*, 503 So. 2d 1, 3 (La. 1987) ("For the doctrine of apparent
authority to apply, the principal must first act to manifest the alleged agent's authority to an
innocent third party.  Second, the third party must rely *reasonably* on the manifested authority of
the agent.") (emphasis added).

[17]*See Indosuez Int'l Fin. B.V. v. National Reserve Bank*, 774 N.E. 2d 696, 699 (N.Y.
2002) ("[A] third party with whom the agent deals may rely on an appearance of authority only
to the extent that such reliance is reasonable."); *O'Banner v. McDonald's Corp.*, 670 N.E. 2d
632, 634 (Ill. 1996) (apparent authority is based on principle that "if a principal creates the
appearance that someone is his agent, he should not then be permitted to deny the agency if an
innocent third party reasonably relies on the apparent agency and is harmed as a result");
*International Boiler Works Co. v. General Waterworks* Corp., 372 A.2d 176, 177 (Del. 1977)
("Ordinarily, an agent can bind the principal on an apparent authority basis only if the third
person involved reasonably concludes that the agent is acting for the principal."); *Lucas v. Li'l
General Stores*, 221 S.E. 2d 257, 263 (N.C. 1976) (holding that rule that actions of the agent
bind the principal "has no application where, as here, the third party, when dealing with the
agent, knew or in the exercise of reasonable care should have known that the agent was not
authorized to enter in to the contract."); *see also Snukal v. Flightways Mfg., Inc.*, 3 P.3d 286, 305
(Cal. 2000) ("[O]stensible authority requires justifiable reliance by a third party.  It must be
shown that the business done by the supposed agent, so far as open to the observation of third

It must be noted that this principal-agent relationship is not entirely voluntary, but instead is mandated by law.  Under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), partnerships over a certain size must have a "tax matters partner."  *See* 26 U.S.C. § 6231(a)(1) (defining "tax matters partner" and outlining default provisions for selection of a TMP).  The TEFRA scheme gives certain rights and responsibilities to the TMP that are not extended to other members of the partnership.[18]  In enacting TEFRA, "Congress aimed to simplify for the Internal Revenue Service, the courts, and taxpayers the treatment of partnership items." *Addington v. Comm'r*, 205 F.3d 54, 59 (2d Cir. 2000).  In order to follow the mandates of TEFRA, the IRS often must deal directly with the TMP.  *See* 26 U.S.C. § 6223 (requiring that the IRS only notify the tax matters partner of the status of administrative proceedings, unless a partner otherwise qualifies, and that the TMP has a duty to "keep each partner informed" of the status of proceedings).

The Court empathizes with the IRS's predicament, but the IRS is not helpless.  As conceded during oral argument, the IRS has the authority to amend tax regulations that

---

parties, is consistent with the existence of an agency, and, as to the transaction in question, the third party was justified in believing that an agency existed.") (quotations and citations omitted).

Some jurisdictions formulate their standard based on the actions of the principal as Texas does, where "[o]ne seeking to charge a principal through the apparent authority of its agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that it purports to exercise." *NationsBank, N.A. v. Dilling*, 922 S.W. 2d 950, 953 (Tex. 1996).  Even under this standard there is not ample evidence that, despite Hoyt's designation as TMP, Martinez or any of the other partners permitted Hoyt to give up extensions of the limitations period to the IRS in return for the IRS granting Hoyt personal extensions.

[18]*See* 26 U.S.C. § 6224(c) (providing that the tax matters partner has authority to enter into settlement agreements with the IRS on behalf of the partnership); 26 U.S.C. § 6230(e) (requiring the TMP to "furnish to the Secretary the name, address, profits interest, and taxpayer identification number of each person who was a partner in such partnership at any time during such taxable year.").

implement TEFRA.  The bankruptcy court noted that, while the IRS has no duty to remove a

TMP, it certainly has the power to promulgate the regulations that provide for when a TMP can

be removed by the IRS.  *See Martinez*, 366 B.R. at 618-19.[19]  The IRS indeed appears to be the

party in the best position to avoid conflicts of interest by appointing a new TMP or at least

having the other partners appoint a new TMP.[20]  While the IRS does claim that it provided some

notice to partners regarding some of the legally questionable aspects of the partnership, it does

not appear that the IRS provided any notice specifically regarding the disabling conflict of

---

[19]  The bankruptcy court reached a similar conclusion as to the power of the IRS to
remove a TMP.  *Martinez*, 366 B.R. at 614-15.  Indeed, relevant Treasury regulations and case
law provide that the IRS has the discretion, but no obligation, to remove a TMP from a
partnership where the TMP is under criminal investigation.  *See* Treas. Reg. § 301.6231(c) –5
("The partnership items of a partner who is notified that he or she is the subject of a criminal
investigation shall not be treated as nonpartnership items under this section unless and until such
partner receives written notification from the Service of such treatment."); *see also Mekulsia v.
Comm'r*, T.C. Memo. 2003-238, 2003 WL 21107687, at *12 (U.S. Tax Ct. May 13, 2003)
("From the above language in *Phillips*, it is clear that section 301.6231(c)-5T . . . does not
require the Commissioner to treat partnership items as nonpartnership items at the
commencement of every criminal tax investigation of a partner.  Accordingly the Commissioner
has discretion to determine in which instances a criminal investigation interferes with the
effective and efficient enforcement of the internal revenue laws.").

[20]At least one commentator has questioned whether a TMP is in a pure agency
relationship, citing the fact that the TMP may be appointed by the Tax Court and the TMP
sometimes "is required to act in ways that are beyond the ordinary control of the partnership."
Michael R. Post, *Representing a Tax Matters Partner: Who is the Client?*, 6 Geo. J. Legal
Ethics, 541-42 (1993).  Because the TMPS is a legislatively-mandated designee, the TMP
therefore is not a pure agent under agency law.  *Id.*, *citing Restatement (Second) of Agency* § 14F
cmt. a, b (1958).  However, even this commentator admits that the TMP is acting as a
"fiduciary," albeit sometimes one with the independence to have "free rein to make many
decisions," suggesting further that the trust law analogy is more apt.  Post, *supra*, at 542.
Regardless, the fact that a TMP is not always under the full control of the partnership, and
therefore the partnership may not be able to actively police him, bolsters this Court's conclusion
that the IRS cannot rely on a TMP who the IRS knows is in conflict with his partners.

interest that existed between Hoyt and his partners prior to seeking the extensions.[21]

The government replies that, to place such a burden on the IRS "would place the government in the unenviable role of an insurer against poor business decisions by taxpayers, reducing the incentive for taxpayers to investigate thoroughly the consequences of transactions into which the enter.  It would be particularly inappropriate for the government to play that role . . . where the transaction at issue is participation in a tax shelter."  Gov't at 39 (quoting *Freeman v. Comm'r*, 93 T.C.M. (CCH) 879 (2007)).  Some burden must be placed on the partners to monitor their tax matters partner.  However, and more significantly, it is clearly inappropriate for the government to continue knowingly rely on false representations from a TMP, particularly where the government is indeed in the best position to ameliorate that conflict.  As stated above, among the best options open to the government would be for the IRS to promulgate new regulations that allow it to act more effectively where a conflict of interest arises between a TMP and his partners.  *See Transpac*, 147 F.3d at 228 ("Finally, and most important, we emphasize that . . . the Secretary undoubtedly has the authority under the Special Enforcement Provision of TEFRA to promulgate reasonable regulations providing for the removal and replacement of TMPs in the event that a conflict of interest develops.").  Therefore, this Court concludes that, if an actual conflict of interest existed between Hoyt and his partnership of which the IRS was aware, then such a conflict would obviate Hoyt's authority to enter into extensions on behalf of the partnership.

---

[21]The government claims that the IRS did provide some notice, but was barred by federal disclosure laws.  Gov't at 38 (citing 26 U.S.C. § 6103).  However, it would seem prudent for the IRS to be able to notify members of a partnership of their designated TMP's conflicts of interest. If the IRS is indeed barred by statute from providing greater notice, then this is Congress' issue to resolve.

2.  Did a Disabling Conflict of Interest Exist?

In further review of the bankruptcy court's opinion, this Court finds that the bankruptcy court was correct in its factual finding that a disabling conflict of interest in fact did exist.  The court first found that the debtor introduced persuasive evidence that Hoyt was "committing fraud against and deceiving his partners."  *Martinez*, 366 B.R. at 615-16.  The court cited IRS internal memos between March 1989 and June 1991 that discuss Hoyt's ongoing fraudulent activities. *Id.* at 616.  Moreover, the IRS sent a letter to Hoyt advising him that "it was considering the imposition of return preparer penalties for the tax years 1989 and 1990" on December 12, 1991, the same day on which the IRS met with Hoyt and "asked him to sign extensions of the statute of limitations for the 1987 and 1988 tax years."  *Id.*  The court concluded that this knowledge "should have put the IRS on notice that a conflict of interest between Hoyt and his partners existed."  *Id.*

The court also found that the debtor successfully introduced evidence showing that "Hoyt was attempting to extract concessions of a quid pro quo nature from the IRS in exchange for agreeing to sign the extensions."  *Id.* at 616-17.  The court catalogued letters between Hoyt and the IRS, as well as a hearing in which the IRS and Hoyt recorded an agreement by which Hoyt executed extensions and the IRS agreed to "forebear assessing any preparer penalties for those same years until the time a notice of FPAA was issued."  *Id.* at 617.

Third, the court determined that Hoyt was "attempting to stall the IRS investigations and delay the issuance of the notices of FPAA, and that the IRS was concerned about issuing notices of FPAA without obtaining extensions of time in which to do so."  *Id.* at 618.  The court found credible IRS memos and letters between 1990 and 1993 recording that Hoyt missed meetings

23

with auditors, failed to provide requested documentation, and otherwise attempted to delay the IRS's cattle count.  *Id.*  The delays were such that the IRS had to sue Hoyt to gain his compliance.  Taking these three findings "as a whole," the bankruptcy court found that the debtor had a "disabling conflict of interest that invalidate[d] the extensions."  *Id.*

The government opposes any finding of invalidity concerning the extensions, stating that no conflict of interest ever existed between Hoyt and Martinez, and that even if one existed, the IRS did not have any actual knowledge of the conflict.  First, it contends that any conflict of interest is "speculative" because Martinez and other partners were profiting from the same illegal tax benefits that the tax shelter partnership gave Hoyt.  Government's Brief at 31 (hereinafter "Gov't").  The government also notes that Martinez never testified that the extensions were against his interest, and even suggests that the extensions benefitted Martinez as earlier cases from 1980-86 had higher interest rates.[22]  Gov't at 32-33.  The government alleges that Martinez was not attentive to the partnership, instead simply "forward[ing] all of the correspondence" from the IRS to Hoyt.  *Id.* at 32.

The government further claims that if there was any conflict, the other partners were aware of it and did nothing.  The government notes that the partners were warned that the cattle partnerships were for tax shelter purposes, and that these shelters would likely be challenged by the IRS.  *Id.*  The government cites letters sent to investors, providing various warnings that the partnerships were functioning in a legally questionable manner.  *Id.* at 39.  Moreover, "[n]o evidence was presented to show that Hoyt tried to ingratiate himself to the IRS."  *Id.* at 36.  The

---

[22]It is not entirely clear why the partnership would feel obliged to grant the IRS extensions, however.  *River City Ranches II*'s reasoning confirms that granting the extensions only would allow the IRS to build a better case against the partnerships.

government claims that Hoyt was "not intimidated" by the IRS because he successfully defended himself in the *Bales* litigation and the IRS's criminal investigations did not result in prosecutions. *Id.* The tradeoffs of extensions between the IRS and Hoyt were simply the "normal 'give and take' that occurs in a complex or tax shelter audit." *Id.* at 37. Finally, the government cites various federal cases that have found Hoyt's extensions to be valid.[23] *Id.*

The Court finds that Hoyt did have a conflict of interest in this case of which the IRS was aware. Again, the Court returns to *River City Ranches II*. In that case, the Ninth Circuit remanded because it found that the record before it "present[ed] at least one apparent conflict which, if substantiated, might render the extensions Hoyt signed legally incompetent and void." *River City Ranches II,* 401 F.3d at 1142. This apparent conflict was shown through Hoyt's granting of extensions to the IRS between February 1991 and March 1993, the period during which "the IRS was first seeking and then performing the headcount that would prove his crimes." *Id.* The Ninth Circuit reasoned that these extensions favored Hoyt to the detriment to his partners because if the IRS were forced to issue the adjustments earlier, the IRS would likely have had more difficulty defending them, and if the IRS were successful, would at least result in lower penalties and interest for the other partners. *Id.* at 1143. In contrast, Hoyt's interest was to prolong the adjustments in order to delay "any threat to the house of cards" he had

---

[23]Of the cases cited for this proposition by the government, there appear to be none that apply the "actual" or "disabling" conflict of interest standard from *River City Ranches II*. One case, *In re Grover*, 1993 WL 632253 (Bankr. E.D. Cal. Nov. 19, 1993) held that "the issue is not whether Hoyt defrauded the debtor and whether the IRS knew about this alleged fraud." *Id.* at *2. However, that court also found that, because there was no criminal prosecution of Hoyt (yet), therefore there was no evidence that any investor was defrauded by Hoyt. *Id.* Since that case was decided, *River City Ranches II* has overruled it, applying a completely different standard and holding that the debtors had the right to discovery to determine what the IRS actually knew.

constructed, and avoiding the adjustments would also prevent his partners from challenging his authority. *Id.* The Ninth Circuit concluded that "Hoyt might well have found it in his interest to offer any concession to the IRS that did not harm him personally, in the hope that it would put off the day of reckoning - perhaps forever, if his long run of luck held out." *Id.*

Similarly, in the present case Hoyt provided the same extensions to IRS agents regarding the partnerships in question. He provided these during the same period as in *River City Ranches II*, 1990-93. The government claims that these extensions are during an irrelevant period because there was no criminal investigation proceeding at this time. However, in *River City Ranches II*, the Ninth Circuit reversed the tax court's finding that there was no conflict because no criminal investigation was occurring when the extensions were executed. 401 F.3d at 1142 (citing *Phillips v. Comm'r*, 272 F.3d 1172 (9th Cir. 2001)). Instead, the *River City Ranches II* court limited the application of *Phillips* to the proposition that "the sole fact of past criminal investigations does not establish a disabling conflict of interest," but that other facts beyond mere criminal investigations can establish a conflict of interest. 401 F.3d at 1142. Moreover, as in *River City Ranches II*, the IRS here was attempting to perform a headcount of the partnership's cattle between 1991 and 1993, the same period that it was seeking extensions from Hoyt, and therefore it seems reasonable to conclude that Hoyt was not exactly cleared of scrutiny during this period. *See Martinez*, 366 B.R. at 608; *see also River City Ranches*, 401 F.3d at 1142 ("Hoyt signed the extensions between February 1991 and March 1993 - that is, in the period when the IRS was first seeking and then performing the headcount that would prove his crimes.").

The IRS replies that it did not have actual knowledge of Hoyt's conflict of interest until

after the final extensions were signed on March 6, 1993, and therefore, even under *River City Ranches II*, Hoyt's extensions are valid.  Gov't at 42.  The government pegs its date of "actual knowledge" as being "as late as the conclusion of the cattle count in April 1993."  *Id.*  While the end date of the cattle count could be construed as the date of actual knowledge for the IRS, the bankruptcy court persuasively cited several IRS internal memos drafted between 1989 and 1991 that specifically cite "fraudulent accounting practices" by Hoyt with regards to the partnerships. *Martinez*, 366 B.R. at 616.  Moreover, after the Ninth Circuit's remand, the tax court persuasively found that the IRS had obtained the minimal actual knowledge by February 1993 (during the cattle count), and that therefore the final extensions signed in March 2003 were invalid.  *River City Ranches III*, T.C. Memo. 2007-171, at *14.  These internal memos substantially establish that the IRS knew of Hoyt's conflict of interest as early as 1989.

Moreover, the fact that Hoyt was seeking personal benefits in return for signing the statute of limitations extensions should have put the IRS on notice of a conflict at the time of the signing of the extensions.  Because Hoyt frustrated the IRS's attempts to conduct the head count, the IRS chose to seek extensions from him in order to be able to defend the FPAAs once they were filed.  After a meeting with the IRS on December 12, 1991, Hoyt faxed the IRS and stated that he would extend the statute of limitations for the partnership if the IRS would agree to "extend to Henry Nathaniel, myself and the other preparers the opportunity to sign Statute of Limitation extensions for the assessment of preparer and any other penalties the IRS may determine should be assessed for the years 1987 through 1989."  *Martinez*, 366 B.R. at 617 (citing Ex. IF).  Moreover, the IRS and Hoyt placed an agreement on the record in federal district court in June 1992, in which the two parties again granted each other extensions.  *Id.* (citing Ex.

27

GV).  The bankruptcy court made the finding that Hoyt's negotiation for extensions of the preparer penalty "shows that in his mind, at least, he was letting his personal interests interfere with his fiduciary duty to the partnerships."  *Id.* at 618.  The fact that Hoyt sought these preparer penalty extensions as early as December 1991 further establishes that the IRS knew of the conflict of interest prior to seeking the statute of limitation extensions for the partnership.

The government contends that these extensions by the IRS were valueless, and simply part of the "normal 'give and take'" of an audit.  Gov't at 37.  However, the better conclusion is that Hoyt agreed to the extensions because he wanted to avoid getting caught.  Hoyt had already beaten the IRS once in *Bales*, so presumably he had nothing to fear.  *See Bales v. Comm'r*, 58 T.C.M. (CCH) 431 (1989).  Yet, he still stifled the IRS's attempts to perform a cattle count, and signed extensions so that the IRS would not be prompted to immediately file an FPAA.  In return for the extensions, he sought, and received, preparer penalty extensions that were for his own personal benefit, and not the benefit of his partners.  The bankruptcy court astutely pointed out that the value that the IRS placed on the preparer penalty extensions is meaningless; the important measure is what value Hoyt placed on them.  *See Martinez*, 366 B.R. at 617-18.

While these extensions helped Hoyt, the Court finds that they likely harmed his partners. The Ninth Circuit noted that the extensions allowed the IRS to delay issuing the FPAAs, which would have put the partners on notice that Hoyt was looting the partnership and break his firm control over the partnership.  *River City Ranches II*, 401 F.3d at 1143.  The government argues that presumably Martinez and the other partners benefitted from the delay because they continued to profit from the illegal shelter, and that the other partners knew of his delay through IRS notices and letters from Hoyt.  However, the partnership would have benefitted the most

28

from FPAAs being issued as early as possible because the IRS would have more difficulty

defending them.  And even if the IRS were successful in defending the FPAAs, the resulting

penalties in interest paid by the partnership would have been lower.  Thus, the partners had a

significant interest in the prompt issuance of FPAAs, while it does seem that Hoyt's best interest

was to prolong the statute of limitations in an effort to frustrate any issuance of FPAAs.

Because Hoyt signed extensions for the partnership that were for his own benefit, and

contrary to the interests of his partners, and moreover because the IRS was aware of this conflict

prior to the final extension in March 1993, the taxes for tax years 1987-1989 should be

discharged.

## IV.  CONCLUSION

This Court finds that, for the 1990-1993 time period, the petitions filed by Hoyt caused

the statute of limitations to be tolled, and therefore the relevant taxes are still assessable against

the debtor.  Regarding the 1987-1989 time period, the Court finds that Hoyt had a disabling

conflict of interest, and moreover because the IRS had actual knowledge of that conflict of

interest at least by the time the final extension was signed, the extensions received by the IRS are

void and the statute of limitations has expired.  Therefore, the relevant taxes for the 1987-1989

tax years are no longer assessable against the debtor.  Accordingly,

**IT IS ORDERED** that the opinion of the bankruptcy court is hereby **AFFIRMED.**

New Orleans, Louisiana, this ___15th___ day of November, 2007.

_____

**STANWOOD R. DUVAL, JR.**

**UNITED STATES DISTRICT JUDGE**